# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT TAYLOR,

        Defendant-Appellant.

UNPUBLISHED
September 22, 2016

No.  325834
Macomb Circuit Court
LC No.  2009-005243-FC

Before:  BORRELLO, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

Defendant was convicted at a jury trial of first-degree felony murder, MCL 750.316(1)(b), carjacking, MCL 750.529a, conspiracy to commit carjacking, MCL 750.529a; MCL 750.157a, kidnapping, MCL 750.349, conspiracy to commit kidnapping, MCL 750.349; MCL 750.157a, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.  Defendant was originally sentenced to mandatory life imprisonment without the possibility of parole for the first-degree felony murder conviction, 25 to 50 years' imprisonment each for the carjacking, conspiracy to commit carjacking, kidnapping, and conspiracy to commit kidnapping convictions, and two years' imprisonment for the felony-firearm conviction.  On defendant's appeal by right, this Court affirmed defendant's convictions but vacated his mandatory sentence of life imprisonment without the possibility of parole for the first-degree felony murder conviction and remanded for resentencing on that offense in accordance with *Miller v Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012).  *People v Taylor*, unpublished opinion per curiam of the Court of Appeals, issued March 21, 2013 (Docket No. 303208), pp 1, 7-8.  The trial court on remand resentenced defendant to life imprisonment without the possibility of parole for the first-degree felony murder conviction.  Defendant now appeals by right the sentence imposed on remand.  We affirm.

Defendant argues that the trial court erred in imposing a life without parole sentence on remand.  We disagree.  "[T]he appropriate standard of review in cases where a judge imposes a sentence of life without parole on a juvenile defendant is a common three-fold standard . . . ." *People v Hyatt*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 325741); slip op at 25.  The trial court's findings of fact are reviewed for clear error, questions of law are reviewed de novo, and the court's ultimate determination as to an appropriate sentence is reviewed for an abuse of discretion.  *Id.*

-1-

In *Miller*, 132 S Ct at 2460, the United States Supreme Court held that a sentence of "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' "

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. [*Id*. at 2468.]

"By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id*. at 2469. The Supreme Court declined to consider the defendants' arguments for a categorical prohibition of life without parole sentences for juveniles but stated that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id*. The Supreme Court noted that it was difficult to distinguish "at this early age between the juvenile offender whose crimes reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id*. (quotation marks and citations omitted). "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*.

Following the issuance of *Miller*, our Legislature enacted MCL 769.25, which became effective on March 4, 2014. See 2014 PA 22. The statute applies to a defendant who was less than 18 years old at the time he or she committed the offense. MCL 769.25(1). The prosecutor may file a motion to sentence a defendant convicted of first-degree murder to life without parole. MCL 769.25(2) and (3). If the prosecutor files such a motion in conformance with the statutory requirements, the trial court must conduct a hearing at which the court considers the factors listed in *Miller* and any other relevant criteria, including the defendant's prison record. MCL 769.25(6). At the hearing, the trial court must specify the aggravating and mitigating circumstances and the reasons for the sentence imposed; the court may consider evidence presented at trial and evidence presented at the sentencing hearing. MCL 769.25(7). If the trial court declines to impose a life without parole sentence, the court must impose a sentence in which the maximum term is at least 60 years and the minimum term is between 25 and 40 years. MCL 769.25(9).

Although the trial court's ultimate determination of the appropriate sentence is reviewed for an abuse of discretion, "the imposition of a juvenile life-without-parole sentence requires a heightened degree of scrutiny regarding whether a life-without-parole sentence is proportionate

to a particular juvenile offender, and even under this deferential standard, an appellate court should view such a sentence as inherently suspect." *Hyatt*, ___ Mich App at ___; slip op at 26. "[A]ppellate review of a juvenile life-without-parole sentence cannot be a mere rubber-stamping of the penalty handed out by the sentencing court." *Id*. Although such a sentence is not presumed to be unconstitutional, a searching inquiry into the record must be undertaken with "the understanding that, more likely than not, the sentence imposed is disproportionate." *Id*. A sentencing court abuses its discretion if it "fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." *Id*. at 27, quoting *United States v Haack*, 403 F3d 997, 1004 (CA 8, 2005).

In *Hyatt*, ___ Mich App at ___; slip op at 27-28, this Court concluded that the trial court had failed to adhere to the directives in *Miller* and its progeny "about the rarity with which a life-without-parole sentence should be imposed." Although the trial court in *Hyatt* focused on the *Miller* factors, "the court gave no credence to *Miller*'s repeated warnings that a life-without-parole sentence should only be imposed on the rare or uncommon juvenile offender." *Hyatt*, ___ Mich App at ___; slip op at 28. Moreover, the trial court in *Hyatt* had emphasized the opinion of a psychologist that the defendant's prognosis for change *in the next five years* was poor; the focus on a five-year period was inconsistent with the holding in *Miller* "that a life-without-parole sentence will be proportionate for the juvenile who is irreparably corrupt and incapable of change – not one who is incapable of change within the next five years." *Id*. This Court therefore remanded the case for resentencing and directed the trial court "to not only consider the *Miller* factors, but to decide whether this individual is the truly rare juvenile mentioned in *Miller* who is incorrigible and incapable of reform." *Id*.

In the present case, the trial court did not err in analyzing each of the *Miller* factors and finding that defendant is the rare juvenile offender who is irreparably corrupt. The trial court expressed full appreciation of the rarity of the circumstances in which a juvenile offender will be deemed incapable of reformation. The court quoted and discussed relevant portions of the holding and analysis in *Miller*, including by noting the admonition in *Miller* that appropriate occasions to sentence juveniles to life without parole will be uncommon. And after analyzing the *Miller* factors, the trial court concluded "that defendant's case . . . presents precisely what the Supreme Court characterized as the rare juvenile offender whose crime reflects irreparable corruption." Accordingly, the trial court accorded appropriate recognition and made pertinent findings regarding the rarity of circumstances warranting a life without parole sentence for a juvenile offender.

Moreover, the trial court's conclusion that defendant is the rare juvenile offender for whom a life without parole sentence is warranted was supported by the court's accurate analysis of the *Miller* factors. We will now discuss each of the *Miller* factors.

The first factor concerns defendant's age and its hallmark features. *Miller*, 132 S Ct at 2468. Defendant was 16 years and 10 months old when he committed the offenses (in marked

contrast to the 14-year-old defendants in *Miller*, 132 S Ct at 2460[1]). The record refutes any claim that the hallmark features of adolescence identified in *Miller*, 132 S Ct at 2468, including immaturity, impetuosity, and a failure to appreciate risks and consequences, played any role in defendant's crimes. This was not, as in *Miller*, 132 S Ct at 2465, a mere botched robbery that turned into a killing. Defendant and his codefendant, Ihab Masalmani, brazenly and forcibly kidnapped and carjacked Matt Landry in broad daylight outside a restaurant, with defendant acting as a lookout while armed with a weapon. Defendant and Masalmani held Landry captive for hours, took him to a drug house in a drug-infested area of Detroit where defendant sat on a couch with Landry while Masalmani used drugs, and then took Landry to a nearby abandoned house at which Masalmani killed Landry in a brutal execution style by shooting him in the back of the head. Defendant's criminal actions over an extended period of time are not reflective of a merely immature or impetuous adolescent who fails to appreciate risks and consequences. Dr. Daniel P. Keating, defendant's expert in cognitive and brain development in adolescents, testified about a developmental maturity mismatch in which an adolescent's limbic system matures more quickly than the prefrontal cortex. This testimony has minimal bearing on these facts, and Dr. Keating did not meet or interview defendant but was only addressing generic brain science. The trial court correctly concluded that the factor of defendant's chronological age and its hallmark features does not weigh in favor of mitigation.

The next factor concerns defendant's family and home environment. *Miller*, 132 S Ct at 2468. The trial court correctly noted that there was uncontroverted testimony that defendant had a difficult family and home environment. Defendant's mother was 13 years old when she had her first child. Defendant was born later, in 1992, and grew up in a very unstable and unsafe environment. His family had an active child protective services record that dated back to 1998. Defendant's father was not present, and defendant was exposed to neglect, violence, and substance abuse. Defendant's mother did not provide adequate food and shelter at times. In light of these far from optimal circumstances, the trial court properly weighed this factor in favor of defendant and against a life without parole sentence.

The next factor is "the circumstances of the homicide offense, including the extent of [defendant's] participation in the conduct and the way familial and peer pressures may have affected him." *Miller*, 132 S Ct at 2468. The fact that defendant did not personally pull the

---

[1] The Supreme Court in *Miller* indicated that it is appropriate to take into account the differences between juveniles of different ages. In particular, when explaining the flaws of a scheme of mandatory life imprisonment without parole for juveniles, the *Miller* Court said: "Under these schemes, every juvenile will receive the same sentence as every other – the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one." *Miller*, 132 S Ct at 2467-2468. The *Miller* majority criticized the dissents in *Miller* for repeatedly referring to 17-year-olds who have committed heinous offenses and comparing those defendants to the 14-year-old defendants in *Miller*. The *Miller* majority explained: "Our holding requires factfinders to attend to exactly such circumstances – to take into account the differences among defendants and crimes. By contrast, the sentencing schemes that the dissents find permissible altogether preclude considering these factors." *Id*. at 2469 n 8.

trigger of the gun does not preclude the imposition of a life without parole sentence. There is no categorical bar on the imposition of a life without parole sentence on a juvenile convicted of felony murder on an aiding and abetting theory. See *Id.*, at 2469, 2471, and *People v Carp*, 496 Mich 440, 528; 852 NW2d 801 (2014), vacated on other grounds by *Carp v Michigan*, ___ US ___; 136 S Ct 1355; 194 L Ed 2d 339 (2016), and by *Davis v Michigan*, ___ US ___; 136 S Ct 1356; 194 L Ed 2d 339 (2016).

Defendant actively participated in the crimes. Defendant admitted to fellow jail inmate Michael Sadur that defendant and Masalmani were trying to "hit a lick," which means to rob someone, and that they noticed the speaker system in Landry's vehicle outside a Quiznos restaurant in Eastpointe. Eyewitness testimony indicated that defendant possessed a weapon and acted as a lookout when Masalmani was trying to force Landry into his vehicle. Defendant told Sadur that, because Masalmani and Landry were struggling, defendant went over and helped to put Landry in the vehicle. Defendant played a critical role in holding Landry captive for several hours before he was murdered, including by sitting on a couch with Landry at a drug house while Masalmani was using drugs; witness Frederick Singleton, who was at the drug house, never saw defendant leave Landry's side at the drug house. *Taylor*, unpub op at 2. Singleton testified that defendant was driving the car when defendant, Masalmani, and Landry arrived at the drug house, while Masalmani and Landry were in the backseat. After leaving the drug house, defendant and Masalmani took Landry to a nearby abandoned house, where either defendant or Masalmani punched Landry[2] and then defendant shot Landry in the back of the head. Defendant asserts that he did not intend to kill Landry. But defendant told Sadur that when they were in Landry's vehicle after the initial kidnapping, Masalmani pulled out a gun, and defendant and Masalmani then told Landry "what time it was[,]" which meant that they were going to shoot him or injure him badly. This statement was made early in Landry's captivity, suggesting that defendant knew throughout the long criminal transaction that he and Masalmani were going to shoot or badly injure Landry. Defendant told Sadur that, after the shooting, defendant took the murder weapon and sold it because he had not yet obtained any money from the crimes. Sadur testified that defendant exhibited no remorse when describing what occurred. The evidence supports the conclusion that defendant was actively and extensively involved in committing the crimes, and there is no indication that defendant was subjected to any family or peer pressure.[3] Therefore, the trial court properly concluded that this factor did not weigh in favor of defendant.

The next *Miller* factor is whether defendant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." *Miller*, 132 S Ct at 2468. The trial court correctly noted that there is no

---

[2] Although the prosecutor contends that defendant punched Landry, it is unclear from Sadur's use of the pronoun "he" whether it was defendant or Masalmani who punched Landry.

[3] Kathleen Schaefer, a defense expert, claimed that peer pressure was a significant issue in this case but declined to elaborate on the specifics of this case, instead asserting only generally that children are susceptible to peer pressure because their brains are not yet fully developed.

evidence of any incapacities of youth that rendered defendant unable to participate in his defense or that led him to implicate himself. This factor therefore did not weigh in favor of mitigation.

The final factor is the possibility of rehabilitation suggested by the circumstances. *Miller*, 132 S Ct at 2468. Dr. Keating explained that a person's prospects for rehabilitation are associated with his or her developmental history. Negative experiences and behaviors during a person's developmental period increase the probability that the person will not succeed in rising above difficulties. Some people do not change; the worse the circumstances, the more likely that the person will not overcome their circumstances.

Kathleen Schaefer, the defense expert on parole and probation, testified generally that people have the capacity to change over time and asserted that defendant could make positive changes. Schaefer agreed with Dr. Keating that there is no test that will determine whether a person can be rehabilitated. Schaefer indicated that a percentage of juveniles will continue on a path of chronic violent behavior. Schaefer agreed with a study indicating that a large proportion of those involved in violent behavior at an early age eventually become chronic violent offenders. She noted that impaired development as well as psychological and emotional difficulties can arise from child abuse and neglect, and such conditions can exist on a long-term basis. Schaefer agreed that some people change and some people do not change. Schaefer was aware that defendant's juvenile record included arrests for truancies, curfew violations, trespass, assaults, entry without permission, and unarmed robbery. Defendant was then convicted in the present case of first-degree felony murder, kidnapping, carjacking, and felony-firearm, and Schaefer agreed that this reflected a type of progression which is not uncommon. Schaefer was not making a prediction about defendant but said that people have the capacity to change. Schaefer said that defendant was introspective in meetings and seemed to understand the gravity of what occurred. Schaefer hopes defendant will build on these developments but lacked proof that he would do so. Her interview of defendant took place in the structured prison setting, and she has not met him on the street where defendant would have to make his own way.

The trial court correctly concluded that this factor did not favor mitigation. Although the difficulty of defendant's upbringing weighs in his favor, it also indicates that he faces significant challenges in improving himself, as reflected in the testimony of Dr. Keating and Schaefer. Although Schaefer made vague allusions to defendant purportedly demonstrating introspection, the record is bereft of evidence that defendant has accepted responsibility or shown genuine remorse for his crimes. No basis exists to conclude that he has made any substantial progress in rehabilitating himself in the many years that he has been incarcerated since committing the offenses, nor is there any discernable basis to conclude that he is likely to do so in the future. Sadur's testimony indicated that defendant demonstrated no remorse when describing the crimes. Defendant has received five misconduct tickets during his incarceration. Defendant's central role in holding Landry captive for many hours, the brutal execution style of the murder, defendant's subsequent selling of the murder weapon, and his failure to accept responsibility or exhibit remorse in the many years since the crimes were committed lend considerable support to the trial court's conclusion that defendant's prospects for rehabilitation are negligible. The trial court properly concluded that this factor did not favor mitigation.

Overall, our review of the record indicates that the trial court accurately analyzed each of the *Miller* factors and correctly concluded that defendant is the rare juvenile offender whose

crime reflects irreparable corruption. The trial court therefore did not abuse its discretion in determining that defendant should be sentenced to life imprisonment without parole.

Defendant next argues that the trial court erred in imposing attorney fees without conducting an inquiry into defendant's ability to pay. We disagree. This Court reviews de novo questions of law, including issues of statutory interpretation. *People v Martin*, 271 Mich App 280, 286-287; 721 NW2d 815 (2006).

MCL 769.1k(1)(b)(*iv*) authorizes the trial court to impose at sentencing "[t]he expenses of providing legal assistance to the defendant." MCL 769.1*l* provides for the deduction of funds from an incarcerated defendant's prison account:

> If a prisoner under the jurisdiction of the department of corrections has been ordered to pay any sum of money as described in [MCL 769.1k] and the department of corrections receives an order from the court on a form prescribed by the state court administrative office, the department of corrections shall deduct 50% of the funds received by the prisoner in a month over $50.00 and promptly forward a payment to the court as provided in the order when the amount exceeds $100.00, or the entire amount if the prisoner is paroled, is transferred to community programs, or is discharged on the maximum sentence. . . .

MCL 769.1k "allows for the imposition of a fee for a court-appointed attorney irrespective of a defendant's ability to pay, and [MCL 769.1*l*] allows the trial court to order that a prisoner's prison account be reduced to satisfy costs imposed under [MCL 769.1k]. This is usually accomplished by a remittance order, which also does not require an ability-to-pay analysis." *People v Jackson*, 483 Mich 271, 286; 769 NW2d 630 (2009). In *Jackson*, 483 Mich at 294, our Supreme Court rejected a challenge to the constitutionality of MCL 769.1k and held that "there is no constitutionally required ability-to-pay analysis until the fee is actually enforced." The *Jackson* Court noted that MCL 769.1*l* provided a procedure for enforcing the fee without an ability-to-pay assessment but concluded that this procedure was constitutional "because the statute's monetary calculations necessarily conduct a preliminary, general ability-to-pay assessment before the prisoner's funds are taken." *Id*. at 295.

> MCL 769.1*l* inherently calculates a prisoner's general ability to pay and, in effect, creates a statutory presumption of nonindigency. The provision only allows the garnishment of a prisoner's account if the balance exceeds $50. Although this amount would be insufficient to sustain a defendant living among the general populace, it is uncontested that a prisoner's "living expenses" are nil, as the prisoner is clothed, sheltered, fed, and has all his medical needs provided by the state. The funds left to the prisoner on a monthly basis are more than adequate to cover the prisoner's other minimal expenses and obligations without causing manifest hardship. Thus, we conclude that [MCL 769.1*l*'s] application makes a legitimate presumption that the prisoner is not indigent. [*Id*.]

"[I]f a prisoner believes that his unique individual financial circumstances rebut [MCL 769.1*l*'s] presumption of nonindigency, he may petition the court to reduce or eliminate the amount that the remittance order requires him to pay." *Id*. at 296.

[W]hen reviewing a prisoner's claim, lower courts must receive the prisoner's petition and any proofs of his unique and extraordinary financial circumstances. Further, the lower courts should only hold that a prisoner's individual circumstances warrant amending or reducing the remittance order when, in its discretion, it determines that enforcement would work a manifest hardship on the prisoner or his immediate family. The trial courts are under no obligation to hold any formal proceedings. They are only required to amend the remittance order when [MCL 769.1*l*'s] presumption of nonindigency is rebutted with evidence that enforcement would impose a manifest hardship on the prisoner or his immediate family. Beyond these basic parameters, we leave it to the trial courts, in their sound discretion, to decide how to adjudicate a prisoner's claim that his individual circumstances rebut [MCL 769.1*l*'s] presumption of nonindigency. [*Id*. at 296-297.]

Defendant's argument that the trial court erred in imposing attorney fees without conducting an assessment of defendant's ability to pay is devoid of merit. An ability-to-pay assessment is required only when the assessment is enforced and the defendant contests his ability to pay. *Id*. at 298. After imposing the fees, the trial court entered a remittance order in conformance with MCL 769.1*l*, requiring the Department of Corrections to collect 50% of funds received by defendant over $50 each month. Defendant argues that the trial court should not have entered this order because "[d]efendant remains indigent, serving a non-parolable life term." Defendant has not followed the proper procedure under *Jackson*. Defendant has not filed a petition or any proofs in the trial court setting forth his unique financial circumstances.[4] Under *Jackson*, it is for the trial court in the first instance to exercise its discretion in considering whether defendant has established that his individual financial circumstances rebut the statutory presumption of nonindigency. Defendant's appellate argument is thus premature, and he has failed to establish any error on the part of the trial court.

We affirm.

/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Michael J. Riordan

---

[4] In his appellate brief, defendant also fails to set forth any unique financial circumstances.